State of NORTH CAROLINA, ex rel., R. Wayne MCDEVITT, Secretary, North Carolina Department of Environment and Natural Resources, Plaintiff,

v.

ACME PETROLEUM AND FUEL COMPANY and Pacemaker Leasing Company, Defendants.

No. 3:98CV505–MU.

United States District Court, W.D. North Carolina, Charlotte Division.

Feb. 13, 2001.

## ORDER

MULLEN, Chief Judge.

This matter is before the court upon cross-motions for summary judgment filed by the Plaintiff State of North Carolina, *ex rel.* William E. Holman, Secretary, North Carolina Department of Natural Resources (the "State") and Defendants Acme Petroleum and Fuel Company ("Acme") and Pacemaker Leasing Company ("Pacemaker"). Hearings were held in this matter on May 1, 2000, and July 24, 2000. Following these two hearings and supplemental briefing by the parties, the court issued Orders in which it ruled upon certain pending issues. This Order constitutes the court's final decision in this matter and, for purposes of completeness, encompasses the previous Orders rendered by the court.

This case was initiated by the State to recover on behalf of the Federal Trust Fund from Defendants the cost of providing bottled water and well filters to private residents affected by groundwater contamination allegedly caused in part by the Defendants' leaking underground petroleum storage tanks ("USTs") at a site called Gilliland's Place in Gaston County.[1] Originally filed in Gaston County Superior Court, the action was timely removed by the Defendants. Pursuant to the Federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6991 *et seq.*, the State seeks approximately $119,000 for

rental costs associated with point of entry filtration systems installed on private wells and approximately $16,000 for the costs of bottled water supplied to the same residents.

## FACTS

In late October of 1992, Mrs. Frances Robertson contacted the Gaston County Health Department complaining of a gasoline odor in her water. After sampling and testing, the Robertson well water was shown to contain benzene contamination of 3,464 parts per billion ("ppb"), a concentration far exceeding both federal and state groundwater standards.[2] According to state toxicologist, Dr. Kenneth Rudo, who testified as an expert witness in the hearing held by the court on July 24, 2000, benzene, a constituent of gasoline, presents a health risk to humans in concentrations above 5 ppb. The risk rises dramatically in concentrations above 50 ppb and the effects of ingestion or inhalation become more immediate. Moreover, such concentrations create a more pronounced danger to children.

Following this discovery of benzene contamination, the Gaston County Health Department and the EPA sampled numerous water-supply wells in the vicinity of the Gilliland's Place Site. Dr. Rudo was responsible for interpreting the results of water sampling at the subject site and, based on the levels of contaminants found in the water, evaluate whether the water was safe for consumption. The samples revealed extensive contamination of both petroleum hydrocarbons and chlorinated solvents.[3] The petroleum contamination

---

1. Pacemaker is the owner of the USTs on the Site and Acme is the operator.

2. Any concentration of benzene above 5ppb exceeds federal drinking water standards, and any concentration above 1 ppb exceeds State Groundwater Standards.

3. The State is only seeking recovery for the costs of water supplied to residents whose wells were contaminated with petroleum products in excess of state and federal standards.

affected numerous wells down gradient from the USTs owned and operated by the Defendants at Gilliland's Place. Based upon the sample results, Dr. Rudo prepared health risk evaluations which were sent to the affected residents.

Based upon the testimony of Dr. Rudo as well as documentary evidence submitted to the court, the time frames from the initial sampling of the water through the completion of the health risk evaluations is summarized in the table below.

| Well | Date Sampled | Date Received by Lab | Date Analyzed | Health Risk Evaluation Completed |
|------|------|------|------|------|
| Robertson | 10/26/92 | 10/29/92 | 11/4/92 | 11/30/92 |
| Branham/Woods | 12/21/92 | 12/28/92 | 1/4/93 | 1/14/93 |
| Toomey | 2/17/93 | 2/22/93 | 2/23–24/93 | 3/16/93 |
| Alexander | 12/21/92 | 12/28/92 | 1/4/93 | 1/14/93 |

As noted above, the Robertson well sample yielded a benzene level of 3464.4 ppb. In the health risk evaluation form prepared on the basis of this sample, Dr. Rudo indicated that the water was highly contaminated and should not be used for drinking, cooking, or bathing/showering. In the comment section of the form, Dr. Rudo wrote: "Please do not use water for ANY purposes as any exposure may pose a significantly increased health and cancer risk over time. DO NOT USE THIS WATER!" A similar warning was issued for the Toomey well, which contained benzene levels of 98.1 and 90.3 ppb, and the Woods well, which contained benzene levels of 84.6 ppb.

The Alexander well was found to contain both petroleum and chlorinated solvent contaminants and the health risk evaluation form recommended that the residents not drink or cook with the water. Dr. Rudo ordered a resampling in three months.

Based upon the results of the water samples, Dr. Rudo testified that he made a determination that a situation existed which required prompt action on the part of the State to protect human health, that is, the residents needed alternative sources of water. Once Dr. Rudo completed the health risk evaluations, he contacted Linda Blalock, the State project manager for the Federal Trust Fund, and forwarded the evaluations to her, along with his recommendation to provide alternate water for the affected residents.

As State project manager for the Federal Trust Fund, Linda Blalock is responsible for making decisions to provide alternate water for qualified residents in the state. Upon reviewing the health risk evaluations prepared by Dr. Rudo, Ms. Blalock ordered bottled water for the affected residents. The Robertson residence received bottled water on January 6, 1993 and a well filter on January 26, 1993. The Branham/Woods residence received bottled water on January 23, 1993 and a well filter on January 26, 1993. The Alexander residence received bottled water on May 22, 1993 and a well filter on August 10, 1995. The Toomey residences received bottled water on April 1, 1993 and a well filter on April 6, 1993. The longest period of time between the initial sampling of the water and the provision of alternate water to the affected residents was approximately 151 days. However, this was in the case of the Alexander well, where the health risk evaluation ordered a resampling within three months. Other than the Alexander well, the maximum period of time between sampling and provision of al-

ternative water was approximately 72 days.

On January 15, 1993, the State sent Defendant Pacemaker a letter. The subject line of the correspondence read "Notice of Regulatory Requirements 15A NCAC 2N Criteria and Standards Applicable to Underground Storage Tanks." The letter advised Pacemaker that groundwater samples collected near Pacemaker's USTs confirmed the presence of contamination, and stated that the letter "is a standard notification and is intended to advise you of the legal requirements pertaining to a release under North Carolina law." The letter went on to warn that failure to comply with corrective action rules may result in the Attorney General seeking an injunction requiring the necessary measures. On April 5, 1993, the State sent a similar latter to Defendant Acme, along with a letter labeled "Notice of Violation," which informed Acme that it was to complete a site assessment in accordance with 15A NCAC 2N .0706. The Notice of Violation noted that a failure to comply "may result in a recommendation for enforcement, the issuance of a Special Order against you under the authority of G.S. 143–215.2, or a request to the Attorney General to institute an action for injunctive relief."

In response to the letters, Defendants hired an environmental consultant and commenced an environmental assessment. Approximately ten months later, Defendants removed four underground tanks and started cleanup of the groundwater. After receiving the State's approval, Defendants installed a pump-and-treat system that filtered contaminants out of the groundwater. Defendants submitted a joint Leaking Petroleum Underground Storage Tank Cleanup Funds Application seeking admission into the Commercial Leaking Petroleum Underground Storage Tank Cleanup Fund ("State Commercial Fund").[4] Owners and operators of leaking commercial USTs who have paid the applicable fees may obtain reimbursement from the State Commercial Fund for cleanup costs incurred in excess of $20,000 or $50,000 (whichever deductible applies) and for "compensation to third parties for bodily injury and property damage" in excess of $100,000, up to a maximum aggregate of one million dollars per occurrence. *See* N.C.Gen.Stat. § 143–215.94B(b)(1) –(5). Defendants paid for the investigation and remedial activities they undertook until they met the $20,000 deductible under the State Commercial Fund. Thereafter, the State Commercial Fund paid for the remainder of the costs of assessment and cleanup at the Site.

On December 13, 1993, approximately one year after the State began providing alternate water to the affected residents, the State sent Defendant Acme a letter listing the costs that had been incurred by the Federal Trust Fund for alternate water supplies for the affected residents as of December 1, 1993 in the amount of $8,839.55, and requested reimbursement. The letter further informed Acme that, as a responsible party, Acme was expected to provide potable water to the affected residents. This letter was the State's first request to the Defendants for reimbursement for costs associated with the provision of alternate water. Defendants have

4. The State Commercial Fund, described at N.C.Gen.Stat. § 143–215.94B *et seq.*, operates similar to an insurance program for owners and operators of USTs, providing coverage for cleanup of environmental damage and for damages to third parties caused by releases of petroleum from USTs. By paying annual UST fees (which are functionally equivalent to insurance premiums), owners and operators can become eligible to seek reimbursement of costs incurred due to their leaking USTs, after payment of the applicable deductible(s).

refused to pay for the alternate water, prompting the instant action by the State to recover those costs. Defendants do not argue that they are not liable for the costs of alternate water, rather, Defendants contend that: (1) the State should not be allowed to recover these costs because it failed to comply with applicable prerequisites to cost recovery under RCRA, and (2) the source of recovery should be the State Commercial Fund, not Defendants.

## DISCUSSION

Title 42, United States Code, Section 6991b(h)(2) provides in pertinent part as follows:

[T]he [State] may undertake corrective action [5] with respect to any release of petroleum into the environment from an underground storage tank only if such action is necessary, in the judgment of the [State], to protect human health and the environment and one or more of the following situations exists:

.　　.　　.　　.　.　.

(B) A situation exists which requires prompt action by the [State] under this paragraph to protect human health and the environment.

.　　.　　.　　.　　.

(D) The owner or operator of the tank has failed or refused to comply with an order of the ... State under this subsection to comply with the corrective action regulations.

The State may recover its costs for corrective action undertaken pursuant to § 6991b(h)(2) from the owner or operator of the underground storage tank responsible for the release of petroleum. Thus, the court had to determine whether the State had complied with § 6991b(h)(2) so

that it is eligible to recover its costs in providing alternate water.

The court first considered whether the State had "ordered" Defendants to comply with corrective action regulations pursuant to § 6991b(h)(2)(D). Corrective action orders "shall be issued and enforced in the same manner and subject to the same requirements as orders under section 6991e of [Title 42]." 42 U.S.C. § 6991b(h)(4). Section 6991e requires that the contents of the order "shall state with reasonable specificity the nature of the violation, specify a reasonable time for compliance, and assess a penalty, if any, which the [State] determines is reasonable taking into account the seriousness of the violation and any good faith efforts to comply with the applicable requirements." 42 U.S.C. § 6991e(c). Moreover, any order issued "shall become final unless, no later than thirty days after the order is served, the person or persons named therein request a public hearing." 42 U.S.C. § 6991e(b).

■ The State argues that the Notices of Regulatory Requirements and the Notice of Violation letters sent to Defendants on January 15, 1993 and April 5, 1993 constituted "orders" within the meaning of the § 6991b(h)(2)(D). The court disagrees. None of the letters sent by the State indicate anywhere in the correspondence that the letter was an "order." In fact, the letters indicated that in the event that Defendants refused to cooperate, the State may then proceed to seek formal orders compelling Defendants to act. Moreover, contrary to § 6991e(c), the letters do not "state with reasonable specificity the nature of the violation." Nowhere in the letters does the State expressly

---

5. Corrective action may include alternative household water supplies. 42 U.S.C. § 6991b(h)(5).

indicate that Defendants are responsible for the provision of alternate water or demand that Defendants do so. In fact, the letters do not even mention the issue of alternate water supplies to third party residents. Finally, none of the letters inform Defendants of their right to request a public hearing or otherwise exercise any appellate rights.

 Having determined that the State had failed to issue any corrective action orders within the meaning of the statute, the court then found that a genuine issue of material fact existed as whether Defendants complied with 42 U.S.C. § 6991b(h)(2)(B) by making a determination that the corrective action undertaken was necessary to protect human health and the environment and that a situation existed which required prompt action by the State to protect human health and the environment. The court held an evidentiary hearing on July 24, 2000 as to this issue. Dr Ken Rudo, state toxicologist, and Linda Blalock, state project manager for the Federal Trust Fund, testified as expert witnesses. After hearing testimony and argument from both parties, the court issued its Findings and Conclusions on September 1, 2000 in which the court found that: (1) Dr. Rudo and Ms. Blalock were acting as agents of the State at the time the health risk evaluations were completed and alternate water was ordered to be provided to the residents affected by contamination at the Gilliland's Place site; (2) upon reviewing the lab analyses of the water samples collected at the site, Dr. Rudo made a determination that prompt action was required to protect human health and the environment; (3) upon reviewing the health risk evaluations completed by Dr. Rudo, Linda Blalock made a determination that the prompt provision of alternate water to the residents in question was required to protect human health;

(4) the State acted promptly to provide alternate water to the affected residences; and (5) waiting approximately one year after the initial provision of alternate water to request reimbursement from Defendants, while untimely, does not preclude the State from seeking reimbursement, but may affect the amount, if any, ultimately recovered.

Having thus satisfied the requirements of 42 U.S.C. § 6991b(h)(2), the State may properly seek reimbursement for the provision of alternate water. The court must now address whether the source of such recovery should be the Defendants or, as Defendants argue, the State Commercial Fund.

Money from the Federal Trust Fund is presently being used by the State to provide alternate water to the affected residents. Title 42, United States Code § 6991b(6)(A) provides in general that "[w]henever costs have been incurred ... by a State ... for undertaking corrective action ... the owner or operator of such tank shall be liable to the ... State for such costs." Thus, it is evident that under federal law Defendants are responsible for the costs of alternate water. Defendants' position is that the State Commercial Fund should reimburse the Plaintiff, as Defendants have paid their fees (premiums) and met the appropriate deductible.

The State Commercial Fund was established and is designed to operate much like an insurance program for owners and operators of UST systems. When corrective action costs are incurred due to leaking USTs for which an owner or operator has been identified and has proceeded with cleanup, as required by statute, the owner or operator "may elect to have the Commercial Fund pay or reimburse the owner or operator for any costs [of corrective action] that exceed [the appropriate deductibles]." N.C.Gen.Stat. § 143–

215.94E(b). If a claim for reimbursement is denied, N.C.Gen.Stat. § 143–215.94E(e) provides a mechanism whereby the owner or operator may appeal the denial as provided for in the North Carolina Administrative Procedures Act (specifically, Article 3 of Chapter 150B of the General Statutes).

■ Nowhere have Defendants asserted that they have followed the process set forth in the statute for the reimbursement or payment of the costs at issue here, nor have they alleged that such claims have been denied and that they have appealed the denial as provided in Article 3 of Chapter 150B of the General Statutes. By arguing that the court should order the State Commercial Fund to pay for the alternate water costs, Defendants are seeking to circumvent the specific process set forth in the statute for the approval or denial of a claim for reimbursement. Under the circumstances, the court finds that it lacks the authority to order the State Commercial Fund to reimburse the Plaintiff. The court finds that pursuant to RCRA Defendants are liable for the costs of alternate water provided to the affected residents. By holding that Defendants are liable for the costs of alternate water, the court in no way precludes Defendants from following the process that should have been followed from the beginning, that is, seeking reimbursement from the State Commercial Fund according to the specific statutory scheme in place in North Carolina.

Section 143–215.94G(e) of the North Carolina General Statutes provides that the State "may recover, in addition to any amount due, the costs of the action, including but not limited to reasonable attorney's fees and investigation expenses." Should the State seek recovery of such costs, the State may file an appropriate motion, along with supporting affidavit(s), to which the Defendants will be allowed to respond.

IT IS THEREFORE ORDERED that the Plaintiff's Motion for Summary Judgment is hereby GRANTED, Defendants' Motion for Summary Judgment is DENIED; and Defendants are held jointly and severally liable for the costs of providing alternate water to the residences described in paragraph 24 of the Complaint, from December 13, 1993, the date Defendants first received notice that such alternate water was being supplied by the State;

IT IS FURTHER ORDERED that Plaintiff file with the court forthwith an affidavit indicating the actual cost of supplying alternate water for the period beginning December 13, 1993 and ending on the date of this Order so that an appropriate judgment may be prepared.